[No. 15930. Department Two. July 14, 1920.]

THE STATE OF WASHINGTON, *Plaintiff*, v. THE SUPERIOR COURT FOR ADAMS COUNTY *et al., Respondents.*[1]

EMINENT DOMAIN (101, 104)—STATE ROADS—PROCEEDINGS—STATUTES—CONSTRUCTION. Under Rem. Code, § 5872, authorizing the state to condemn lands for state highways in the manner prescribed for condemnations for county roads, and § 5635, providing for county road condemnations, in case the commissioners after hearings and notices are unable to agree with owners, "in the manner provided by law for taking private property for public use" by proceedings under Id. §§ 921-936, the state may proceed under the last named sections without the hearings, notices or agreements referred to in the establishment of county roads, it not being the intention to impose upon the state the preliminary details imposed upon counties.

SAME (39) — NECESSITY FOR APPROPRIATIONS — EVIDENCE — SUFFICIENCY. A reasonable necessity for the condemnation of lands for a main state highway is shown, notwithstanding evidence that the lands are valuable for wheat growing in large tracts, that the straight road sought would cut up the tracts and greatly reduce the value of the lands, and that present roads following the section lines are available, where it appears that the section line roads would require dangerous curves and increase the length of the road one mile, the original paving of which would cost $25,000.

Certiorari to review a judgment of the superior court for Adams county, Truax, J., entered May 14, 1920, in favor of the defendants, dismissing consolidated actions to condemn rights of way for a state road, tried to the court. Reversed.

[1]Reported in 191 Pac. 413.

*The Attorney General* and *John A. Homer, Assistant,* for plaintiff.

*Chas. P. Lund,* for respondents.

BRIDGES, J.—This is a suit to acquire by condemnation right of way for a state road.

The legislature of 1915 created the Central Washington Highway in the following words:

"A primary state highway is established as follows: A highway connecting with the Inland Empire Highway at Pasco, Washington; thence by the most feasible route through Connell, Ritzville, Sprague and Cheney to Spokane, Washington, to be known as the Central Washington Highway." Section 5878-2 (d), Rem. Code; Laws of 1915, p. 486, § 5.

The state authorities are now procuring right of way for this highway. It has already acquired most of the right of way between the town of Connell and the town of Lind, a distance of several miles. Being unable to acquire by purchase the right of way through a part of three contiguous sections, it instituted five condemnation suits; one to secure the right of way through a part of the northeast quarter of section 4, township 14, range 33 E. W. M.; another for the right of way through a part of the southeast quarter of section 33; a third for right of way through a part of the southwest quarter of section 34; a fourth to acquire the right of way through a part of the northwest quarter of section 34; and the fifth for right of way through a part of the northeast quarter of section 34, all in township 15, range 33 E. W. M. By stipulation, all these cases were consolidated for the purpose of the hearing on the question of necessity. At the termination of the hearing, the trial court entered an order in each case to the effect that the testimony failed to show a necessity to acquire the right of way through

the lands described, and ordered the suits dismissed with costs. Later, it was stipulated between the parties that the various cases might be consolidated in one application to this court for a writ of certiorari. Upon such application, the writ was issued and the complete record is now before us.

There are two chief questions presented for our determination: First, has the state proceeded to acquire the right of way in the manner provided by the statutes of the state of Washington; and second, does the testimony establish a necessity for the taking of the particular lands involved.

Section 5872, Rem. Code, provides as follows:

"The state highway commissioner is hereby authorized to acquire right of way on behalf of the state for state roads by gift, purchase or condemnation in the manner prescribed by law for the acquirement or condemnation of lands for county roads. The cost of such right of way shall be paid for from the fund apportioned to the state road for which such right of way is acquired. . . ."

Section 5623 et seq., Rem. Code, provide a complete program for the laying out and establishment of county roads and acquiring rights of way therefor. These sections provide that county roads may be established either by resolution of the board of county commissioners or upon petition by householders. They provide for various hearings before the board of county commissioners, of which hearings the persons interested must be given notice. Section 5634 provides that the commissioners shall determine the amount of damages to which each landowner is entitled, and by § 5636, such amount must be tendered to the landowner. Section 5635 provides that, if such award of damages is not accepted, the board shall direct that the right of way be procured by condem-

nation, "in the manner provided by law for the taking of private property for public use, and to that end are hereby authorized to institute and maintain in the name of the county the proceedings provided in sections 921 to 936 of this act. . . ." The sections last referred to provide the manner and way whereby corporations may acquire right of way by condemnation.

We find, therefore, that the condemnation procedure for a state road right of way must be the procedure provided for acquiring by condemnation county road rights of way, and that county road rights of way must be condemned in the manner provided for condemnation of rights of way by corporations. The state, in the cases under discussion, has proceeded in the manner provided for acquiring rights of way by corporations. The defendant, however, contends that, since the statute (§ 5872, Rem. Code) authorizes the state to condemn "in the manner prescribed by law for the acquirement or condemnation of lands for county roads," it is necessary that the state follow and comply with the complete preliminary provisions with reference to acquiring rights of way for county roads. In other words, it is contended that it is necessary that the state highway board hold meetings and give notices, determine the amount of damages, and make tender thereof, and otherwise comply with the county road act, before it could authorize the commencement of a condemnation suit. We do not so construe the statute under discussion. It does not mean that the state highway commissioner or the state highway board shall carry out all the details preliminary to a condemnation provided for acquiring rights of way for county roads. It simply means that the actual condemnation proceedings shall be those pro-

vided for acquiring county roads. Reading the various statutes together, we find that condemnation for state roads shall be the same procedure provided for condemning for county roads, and that condemnation for the latter shall follow the procedure provided for acquiring rights of way by corporations. The state road statute means the same as if it had provided that state road rights of way must be acquired in the manner provided by law for acquiring rights of way by corporations. To give the state highway statute the construction contended for by defendant would be to impose upon the state duties which it could not perform and which would have the effect of making it impossible for the state to acquire by condemnation rights of way for state roads. If the legislature had intended that the state should carry out the various preliminary details imposed upon counties, it would certainly have expressly so said. We have no doubt, therefore, that the state is proceeding in the manner provided by law.

The next question is whether the testimony is sufficient to authorize the state to acquire the particular right of way sought.

Section 925, Rem. Code, provides that, if at a proper hearing on the question of necessity the court be satisfied "that the land, real estate, premises or other property sought to be appropriated are required and necessary for the purposes of such enterprise," then it may make the preliminary order of necessity. The duty resting on the courts under this statute is stated in *State ex rel. Postal Telegraph-Cable Co. v. Superior Court,* 64 Wash. 189, 116 Pac. 855, where we said:

"We believe that the correct construction of this statute is that those invested with the power of eminent domain have the right in the first instance to select the land which, according to their own views,

is most expedient for the enterprise, and that it invests the court with the power to. determine whether specific land proposed to be taken is necessary in view of the general location, and to finally determine the question of necessity for the taking of such specific land when there is evidence of bad faith, or oppression, or of an abuse of the power in the selection. Plainly, the selection by the condemnor is evidence of the highest character that the land selected is necessary for the enterprise, and in the absence of clear and convincing evidence to the contrary, it conclusively established the necessity. It is sufficient to make a strong *prima facie* case, but when convincing evidence is adduced by the owner that the land sought is not reasonably necessary and that a slight change of location to other of his land will equally meet the necessity of the taker and be of much less damage to the owner, then it is incumbent upon the taker to rebut such evidence, since the refusal to make such change, if unexplained would amount to oppression and be an abuse of the power.''

The testimony tends to show that the lands through which the proposed right of way runs form a part of a valuable wheat raising section of the state; that such lands and those in the immediate vicinity are practically level; that they are worth about $75 per acre; that they are farmed and cultivated by means of large tractors, and that tractors can be used successfully only on large. tracts of land; that, if these lands are cut up by the proposed right of way, they will be reduced in value from twenty-five to fifty per cent; that there are county roads already established and open for travel, around nearly all of the sections of land involved, as well as those sections in the immediate vicinity, which county roads follow the section lines, and that the state road could follow some one or more of these section line roads and thereby do a great deal less damage and injury to the lands sought to be condemned.

On the contrary, the state's testimony tends to show that the road which it is seeking to build will be a main highway and that it is necessary to make it as short and straight as possible; that, if the section line roads should be followed, the road would be lengthened in this immediate locality about one mile over the proposed road; that it would have sharp turns and bends which would be dangerous to travelers; that the expense of constructing and maintaining the additional mile of road would be great, and that it has already acquired its right of way on each side of the tracts of land here in suit.

At the trial it was orally agreed that, if the state would follow the section line roads, the landowners would procure for the state, without cost to it, reasonable quantities of land at the various section corner turns, so that, at such corners, the road curves could be flattened out in such a manner as to make reasonably safe turns. If the testimony of the owners is to be accepted, it must be admitted that the lands through which it is sought to acquire the right of way will be materially damaged. On the other hand, the court must take knowledge that this road when completed will be extensively traveled by fast moving automobiles and motor trucks, and that the roads of by-gone days are wholly inadequate for present day purposes. While section line roads may be sufficient for the accommodation of an immediate vicinity, they are wholly inadequate for a main line road. The advent of the automobile and the auto-truck, and the consequent extensive and ever-growing use to which roads are put, makes it necessary that main thoroughfares be built upon the best route obtainable. If the landowners in this locality may compel a main state road to be lengthened and to contain many, and perhaps more or less dangerous curves, in order to avoid cut-

ting up and damaging their lands, so may landholders elsewhere, for equally good reasons, compel state roads to be lengthened, and the cost of construction and maintenance thereof greatly increased. Such a doctrine, carried to its legitmate end, would make main and heavily traveled state roads little better than the common community roads. The desire of the landowners here to maintain their lands as they are, so that they can better use them for farming purposes, is a laudable one, but that desire must give way to the greater and more important necessities of the general public, particularly where, as here, under the law, the state must compensate them for such damage as they will suffer.

Nor can we very seriously consider the offer of the landowners to provide land to flatten the curves, should the road follow the section lines. In the first place, there is no agreement as to how much land would be necessary for these purposes, or as to what degree the curves should have. There is no certainty that the parties can agree on these things, nor, for that matter, that the landowners can acquire the land for these purposes. But if it be conceded that these things could be agreed upon and done, yet but little good will have been accomplished, because the road would still be about a mile longer and would contain many additional objectionable curves. The testimony shows that it would cost about $25,000 to put the original pavement on this extra mile, to say nothing of the additional cost of maintenance. Every additional mile on a main road adds greatly to the cost of construction and maintenance; adds expense to every auto, every motor truck, every vehicle which travels it. Every curve makes additional dangers to the traveler. The reasons which induce railroad companies to spend large sums in flattening or altogether cutting out

curves, and in so building or rebuilding the road as to get the shortest possible distance between given points, are, in a very great measure, applicable to the building of main highways.

We are satisfied that the testimony shows a reasonable necessity for acquiring this right of way, and that the learned trial court was in error in holding to the contrary. The judgment is reversed, and the cause remanded with directions to the lower court to enter an order of necessity and permit the state to proceed to the assessment of damages as provided by law.

HOLCOMB, C. J., MOUNT, TOLMAN, and FULLERTON, JJ., concur.